UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

PATRICIA A. GANTT,              )        Case No.  1:06CV2480
                               )
            Plaintiff,         )        MAGISTRATE JUDGE
                               )        GEORGE J. LIMBERT
      v.                       )
                               )
MICHAEL J. ASTRUE,             )        MEMORANDUM OPINION & ORDER
COMMISSIONER OF                )
SOCIAL SECURITY,               )
                               )
            Defendant.         )

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB).  ECF Dkt. #1,16.  Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his June 30, 2006 decision by finding that she was not disabled because she could perform a significant number of jobs existing in the economy.  ECF Dkt. #27.  Plaintiff states that the ALJ failed to give deference to the opinions of her treating physicians, failed to re-contact her treating physician to clarify information, failed to incorporate all limitations into his hypothetical question to the vocational expert (VE), and failed to find her disabled pursuant to Social Security Ruling (SSR) 85-15.  *Id.*  For the following reasons, this Court affirms the decision of the ALJ.

**I.      PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on February 25, 2003 alleging disability beginning October 28, 2002 due to panic attacks which caused her heart to race, and caused dizziness, numbness

1

and concentration problems.  Tr. at 85-87, 98.   The Social Security Administration (SSA) denied Plaintiff's application and affirmed the denial upon reconsideration.  *Id*. at 52-61.  Plaintiff requested a hearing before an ALJ and a hearing was held on August 25, 2005.  *Id.* at 62, 289.  At the hearing, Plaintiff testified and was represented by counsel.  *Id.* at 289.  A VE was also present at the hearing, but did not testify because the ALJ learned that Plaintiff lacked updated treatment and had a relatively outdated consultative report.  *Id*. at. 333-335.  Accordingly, the ALJ continued the hearing in order to allow Plaintiff to undergo a consultative psychiatric evaluation.  *Id*. at 335.

On June 16, 2006, a different ALJ held a supplemental hearing, with Plaintiff present, as well as her counsel and a VE.  Tr. at 337.  Plaintiff testified, as did the VE.  *Id.*  At the hearing, Plaintiff's attorney informed the ALJ that Plaintiff had begun treating with a psychiatrist, Dr. Kantos, and was seeing psychologist Kirsten De Lambo, Ph.D.  *Id*. at 349.  Plaintiff's attorney repeated to the ALJ during the hearing that Dr. De Lambo had the benefit of all the Plaintiff's prior medical records when she began treating Plaintiff and provided a medical source statement.  *Id*. at 349, 350, 351, 399, 401.

On June 30, 2006, the ALJ denied Plaintiff's application for DIB, finding that while she had the severe impairments of major depression and panic disorder without agoraphobia, those impairments, individually or in combination with other impairments, did not meet or equal a listed impairment.  Tr. at 14.  The ALJ further found that  Plaintiff could perform work at all exertional levels existing in significant numbers in the economy with the non-exertional limitations of simple, routine, repetitive tasks in a low-stress work environment with occasional decision-making, occasional changes in the work setting, and the occasional exercise of judgment, no production rate pace work and only occasional interaction involving superficial, non-confrontational, non-negotiation and non- arbitration contact with the public and coworkers.  *Id*. at 15.

On July 14, 2006, Plaintiff's counsel sent a letter to the ALJ indicating that she and Plaintiff had received the unfavorable decision of the ALJ and they were requesting that the ALJ vacate the decision in light of new and material evidence from Dr. De Lambo in a letter in which she indicated that she possessed Plaintiff's entire medical record when she formulated her opinions and conclusions about Plaintiff. Tr. at 8, 9.

On July 28, 2006, Plaintiff's counsel sent a letter requesting that the Appeals Council review the ALJ's decision. Tr. at 28. The Appeals Council denied the request for review, finding that counsel's contentions did not provide a basis for changing the ALJ's decision. *Id.* at 24.

On September 13, 2006, Plaintiff's counsel sent a letter to Administrative Appeals Judge Gabriel DePass requesting that he grant a motion to vacate the September 8, 2006 Appeals Council denial because of new and material evidence that was submitted to the ALJ after the June 16, 2006 hearing. Tr. at 7. On September 27, 2006, Judge DePass found no reason to reopen the ALJ's decision, even considering Dr. De Lambo's letter indicating that she had reviewed Plaintiff's prior medical history in making her medical source statement. *Id*. at 5.

On October 13, 2006, Plaintiff filed a timely complaint with this Court, and Defendant answered the complaint. ECF Dkt. #s 1, 11. Both parties have filed briefs addressing the merits of the case and Plaintiff has filed a reply brief. ECF Dkt. #s 16-18. At issue is the decision of the ALJ dated June 30, 2006, which stands as the final decision. Tr. at 12-20; 20 C.F.R. § 404.984.

**II.** **SUMMARY OF MEDICAL EVIDENCE**

Plaintiff has had a history of panic attacks and anxiety for which she initially received treatment through her primary care physician, Dr. Borukh, at the Cleveland Clinic Family Health Medical Center. Tr. at 249-265. Dr. Borukh placed Plaintiff on Xanax and Paxil, and Plaintiff reported various improvements and setbacks between 2001 and 2002. *Id.*

On October 22, 2001, psychiatrist Dr. Billowitz conducted an intake evaluation on Plaintiff at Access Behavioral Care. Tr. at 143. He found that Plaintiff had no prior psychiatric treatment except for the receipt of medication from Dr. Borukh. *Id.* Plaintiff reported to Dr. Billowitz that her mother and father both died when she was twelve years old and she had lived with her aunt and others. *Id.* at 144. She indicated that she had been suffering from panic attacks since high school. *Id.* Dr. Billowitz found Plaintiff to have a flat affect, a normal mood, normal speech, intact thought processes, no memory impairment or judgment or attention impairment and found her to have a cooperative attitude, fair insight and normal motor activity. *Id.* at 145. He related the effects of Plaintiff's mental impairments on her family, relationships and work as mild, indicating that she had a good marriage and good job. *Id.* Plaintiff had reported that the medications were helping. *Id.* Dr. Billowitz diagnosed Plaintiff with anxiety disorder not otherwise specified and a history of depression, and assigned her a global assessment of functioning score of 64, which indicated mild symptoms. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. rev. 2000)(DSM-IV). Dr. Billowitz prescribed medication for Plaintiff and ordered counseling. *Id.* at 146.

On February 14, 2002, Plaintiff presented to Dr. Borukh indicating that she was feeling much better. Tr. at 256. She was sleeping better and did not have to use the Xanax as much. *Id.*

On November 20, 2002, Plaintiff presented to the Cleveland Clinic Family Health Medical Center complaining of dizziness and a sudden onset of heart palpitations. Tr. at 150. She was diagnosed with palpitations. *Id.*

On February 11, 2003, Plaintiff presented to Dr. Borukh after she tripped on the stairs and injured her thumb. Tr. at 148. She also complained of heart palpitations since November of 2002 and complained of her fingers, toes and nails turning blue during cold weather. *Id.* Plaintiff was diagnosed with Raynaud's Syndrome, an abrasion to her thumb and palpitations. *Id.*

-4-

On February 15, 2003, Plaintiff presented to the emergency room complaining of a rapid heart rate, dizziness and chills. Tr. at 183. She told medical personnel that she was not sure if she was having a panic attack as she did experience them frequently. *Id.* at 184. Testing was performed for arrythmia versus anxiety and Plaintiff was discharged with a diagnoses of fast heart rate and a prescription for Xanax. *Id.* at 195.

On February 21, 2003, Plaintiff presented to Dr. Borukh requesting treatment for depression and anxiety. Tr. at 236. Plaintiff stated that she daily felt depressed, and had anxious feelings, panic attacks, weight gain, change in appetite, insomnia, fatigue, difficulty concentrating, impaired memory and recurrent thoughts of death. *Id.* Dr. Borukh noted that Plaintiff suffered from palpitations. *Id.* at 237. She further noted that Plaintiff had inappropriate laughter and an anxious mood, but normal thought content. *Id.* at 237-238. Dr. Borukh diagnosed depression and anxiety and prescribed Xanax and Paxil. *Id.* at 238.

On March 21, 2003, Plaintiff presented to Dr. Borukh for follow-up on her panic attacks and she reported that since she started on Paxil, she suffered less panic attacks. Tr. at 230. Dr. Borukh diagnosed anxiety and panic disorder and continued Plaintiff on Paxil. *Id.* at 231.

On March 24, 2003, Dr. Billowitz completed an agency questionnaire indicating that he first saw Plaintiff on October 22, 2001 and last saw her on August 31, 2002 for a total of three times during this period. Tr. at 138, 140. Dr. Billowitz described Plaintiff's significant clinical mental status abnormalities as a history of panic attacks and insomnia that were severe at times and rendered her unable to leave the house. *Id.* at 139. He found that Plaintiff had no cognitive impairment and no significant restriction in her daily living activities except when she had agoraphobia in the past. *Id.* He further found that Plaintiff's impairments had no effect on her interests, habits or behavior and they presented no significant problems with social interactions. *Id.* He also indicated that Plaintiff's

symptoms were much improved with treatment and she had no impairment as of her last appointment with him on August 31, 2002. *Id.* at 140.

On May 1, 2003, Plaintiff presented to Dr. Borukh for follow-up regarding her panic attacks, which she stated were occurring about three times per week and mostly at night. Tr. at 227. Dr. Borukh increased Plaintiff's Paxil dosage. *Id.* at 228.

On May 5, 2003, Plaintiff underwent an evaluation by Clinical Psychologist Michael Leach, Ph.D., at the request of the agency. Tr. at 161. Plaintiff informed Dr. Leach that she had received treatment for anxiety for several years and was taking Xanax and Paxil to treat her symptoms. *Id*. at 162. She indicated that her panic attacks and anxiety kept her from working because they occurred frequently throughout the week, sometimes up to two per day, and they even wake her up in the middle of the night. *Id.* She reported that she gets incredibly stressed when faced with a new situation and her symptoms persist despite medication and treatment. *Id.* She stated that she panicked when she was confronted by people or when she is forced to interact with others. *Id*. at 162. She was frustrated with her situation and indicated that she felt useless. *Id.* at 163. She further stated that it felt like she was having a heart attack when she has a panic attack and she has difficulty with crying spells and feels hopeless about her future. *Id*.

Upon examination, Dr. Leach reported that Plaintiff maintained very little eye contact during the interview, had difficulty maintaining attention, and appeared anxious. Tr. at 162. She responded well to questions, but her affect varied from anxious to blunted during the interview. *Id.* Plaintiff was alert and cooperative, with no evidence of psychosis, and she had adequate insight and judgment. *Id.* Dr. Leach found that despite Plaintiff seeking out professional services, her symptoms persisted. *Id*.

Psychological testing revealed questions regarding validity, but Dr. Leach believed that it was due to Plaintiff's feeling of an undue amount of stress and pressure when she completed the test which

was consistent with her symptomatology related during the interview.  Tr. at 164.  The elevated scales on the test were believed by Dr. Leach to be consistent with her overall depressed mood with an extreme amount of anxiety and feeling acutely pressured throughout her life.  *Id.*

Dr. Leach diagnosed Plaintiff with panic disorder without agoraphobia and assigned her a GAF of 65, which indicated mild symptoms.  Tr. at 164.  However, he found that treatment had provided Plaintiff only marginal improvement and she continued to suffer from depressed mood and anxiety.  *Id.*  In conclusion, Dr. Leach opined that Plaintiff was

> suffering from significant psychological and emotional distress affecting her ability to work.  It is likely that the stresses and pressures of daily work would increase her anxiety.  In addition, her problems focusing and concentrating, secondary to her emotional issues, would likely inhibit her abilities to carry out duties and follow instructions given to her by a supervisor.  In addition, her anxiety in dealing with others is likely to negatively impact her abilities to communicate effectively with co-workers and other people in a working environment.

*Id.* at 164-165.

On May 17, 2003, Psychologist Carl Tisher, Ph.D. completed a psychiatric review technique form for the agency upon review of Plaintiff's file.  Tr. at 166.  He based his medical disposition upon Listing 12.06, anxiety-related disorders, specifically panic disorder, and found that Plaintiff was mildly limited in her daily living activities, moderately limited in maintaining social functioning, mildly limited in maintaining concentration, persistence and pace, and she had suffered no repeated episodes of decompensation or deterioration.  *Id.* at 171-176.  In completing the mental residual functional capacity (MRFC) assessment form, Dr. Tisher found that Plaintiff was not significantly limited in understanding and memory or in sustained concentration and persistence, but she was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them.  *Id.* at 179.  He further found that Plaintiff was moderately limited in interacting

appropriately with the general public, accepting instruction and responding to criticism from supervisors and in getting along with coworkers and peers without distracting them or exhibiting behavioral extremes.  *Id.* at 180.  He found no evidence of significant limitations in Plaintiff's abilities to adapt to changes in the work setting.  *Id*.  Dr. Tishler noted that while Plaintiff suffered from panic attacks which may interfere with her ability to accept negative criticism or to cope with large groups of people, she was not limited cognitively or adaptively, although she had difficulty with the general public as she had to take someone with her in order to go shopping.  *Id*. at 181.  He found that Plaintiff followed a daily schedule, took care of household chores, enjoyed exercising and playing video games and drove a car as needed, although not on the freeway.  *Id.* Psychologist John Malinky, Ph.D. affirmed Dr. Tishler's findings.  *Id*.

On July 14, 2003, Dr. Borukh saw Plaintiff for a comprehensive evaluation.  Tr. at 222. Plaintiff reported feeling well in general and she reported no problems or concerns.  *Id*.  Dr. Borukh concluded that Plaintiff's anxiety was stable and she was continued on Paxil.  *Id.* at 225.

On August 28, 2003, Plaintiff presented to the Cleveland Clinic Family Health Medical Center for follow-up evaluation of her anxiety and panic attacks.  Tr. at 219.  Dr. Borukh noted that Plaintiff reported more frequent panic attacks due to increased stress as she was attending school full-time and working part-time.  *Id.*  Plaintiff was diagnosed with anxiety and panic disorder and she was continued on Paxil with a prescription for Buspar as well.  *Id*. at 219-220.

On October 30, 2003, Dr. Borukh completed an agency questionnaire indicating that she treated Plaintiff from February 6, 2001 through August 28, 2003.  Tr. at 196.  She reported that Plaintiff's significant clinical mental status abnormalities included anxious and depressed moods, but normal thought content.  *Id.* at 197.  She indicated that she did not see any cognitive or intellectual limitations and she was not sure of any significant restrictions in Plaintiff's daily living activities

-8-

resulting from her impairments. *Id.* Dr. Borukh reported that Plaintiff's anxiety had been stable earlier in the year but the panic attacks were now becoming more frequent. *Id.* Dr. Borukh further indicated that Plaintiff has had anxiety and panic attacks since she began treating her and Plaintiff had responded to Xanax and Paxil. *Id.* at 198. She opined that Plaintiff could not handle stress well and she diagnosed her with generalized anxiety disorder and panic disorder. *Id.*

On November 11, 2003, Plaintiff presented to the emergency room complaining of chest pain that started to radiate to her left side. Tr. at 199-200. Testing was conducted and Plaintiff was diagnosed with nonspecific chest pain and prescribed Nexium. *Id.* at 202.

On November 20, 2003, Plaintiff presented to the Cleveland Clinic Family Health Medical Center complaining of intermittent chest pain over the past few days and seeking follow-up from her emergency room visit. Tr. at 216. She reported that the pain was more frequent and her panic attacks were as well. *Id.* She was assessed with chest pain not otherwise specified. *Id.*

On November 16, 2005, Psychiatrist Emil Ibrahim evaluated Plaintiff at the request of the agency. Tr. at 266. Plaintiff reported that she had been depressed since high school but had been treating for her depression and anxiety only over the past three years. *Id.* She indicated that Dr. Borukh had referred her to a psychiatrist and she saw him twice, but she did not continue treating with him. *Id.* She indicated that she could not trust people with her personal affairs and had difficulty with trust issues. *Id.* She reported that she was sexually abused and raped from the age of 12 through 15 by family members after her parents died. *Id.*

Plaintiff described her panic attacks as accompanied by chest pain and shortness of breath. Tr. at 266. She stated that she had one or two per day and they sometimes lasted for hours. *Id.* She also reported that the Xanax was not helping. *Id.* She denies prior hospitalizations for psychiatric problems. *Id.* Plaintiff was currently working in airport security on a full-time basis, was separated

from her husband at this time, and has four children, three adults and one minor. *Id.* at 267.

Upon evaluation, Dr. Ibrahim found Plaintiff cooperative, with slightly slow psychomotor activity, clear and logical speech and thought content, depressed mood that was tearful at times, and a sad affect. Tr. at 267. Plaintiff was alert and oriented and was able to recall three of three objects after five minutes. *Id.* She could not perform serial sevens and attempted serial threes, but could not continue. *Id.* She could spell digits forward but not backward. *Id.*

Dr. Ibrahim diagnosed Plaintiff with major recurrent depression, and panic disorder without agoraphobia, and assigned Plaintiff a GAF of 70. Tr. at 268. Dr. Ibrahim opined that Plaintiff had a good ability to relate to others, adequate abilities to understand and follow simple instructions, fair to poor abilities to maintain attention and concentration, and good ability to withstand stress and pressure in day-to-day activities. *Id.* In completing the medical source statement of Plaintiff's mental ability to do work-related activities, Dr. Ibrahim found that Plaintiff's ability to understand, remember and carry out instructions were not affected by her impairments. *Id.* at 269. He also found that Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were not affected by her impairments. *Id.* at 269-270.

On February 27, 2006, psychologist Dr. De Lambo conducted her initial evaluation of Plaintiff. Tr. at 280. Plaintiff's presenting problems included panic attacks, anxiety, and chronic depression, and Dr. De Lambo found Plaintiff's mood to be anxious and her affect to be inappropriate. *Id.* She diagnosed panic disorder without agoraphobia, major depressive disorder, rule out post-traumatic stress disorder, personality disorder not otherwise specified. *Id.* She assigned Plaintiff her a GAF of 50, which indicated serious symptoms. *Id.* at 281. She found that Plaintiff had negative self-talk, poor conflict skills, poor affect expression, and poor insight, and she needed to be taught relaxation and coping skills. *Id.*

-10-

Plaintiff treated with Dr. De Lambo again on March 8, 2006 and Dr. De Lambo continued to collect information about Plaintiff relating to the death of her parents when she was a child and the sexual abuse that she suffered. Tr. at 279. They also discussed the relaxation techniques. *Id.* She saw Plaintiff again on March 22, 2006 and indicated that Plaintiff was progressing. *Id*. at 278. She met with her again on April 5, 2006 and April 26, 2006 and noted that Plaintiff was progressing although she reported problems with motivation because she was sleeping most of the day. *Id*. at 277.

On April 25, 2006, Psychiatrist Peter Kantos performed a psychiatric evaluation of Plaintiff. Tr. at 272. Plaintiff reported having panic attacks every morning and periodically in the afternoon. *Id.* She had to stop taking Paxil because she lost her insurance. *Id.* Dr. Kantos found Plaintiff's speech to be clear, her thought process intact, her demeanor preoccupied, her eye contact normal, and her activity normal. *Id.* at 274. He further found her depression and anxiety to be mild, as well as her anger and anhedonia, and he found her affect resonant and labile, with no memory disturbance or attention deficit. *Id.* He diagnosed depressive disorder not otherwise specified, anxiety disorder, panic attacks and agoraphobia. *Id.* at 275. He assigned her a GAF of 54, which indicated moderate symptoms. *Id*. He continued Plaintiff's psychotherapy with Dr. De Lambo. *Id.*

On June 9, 2006, Dr. De Lambo completed a mental RFC assessment form indicating that Plaintiff had marked impairment in her abilities to relate to other people, perform her daily activities, maintain concentration and attention for extended periods, sustain a routine without special supervision, and to perform activities within a schedule, maintain regular attendance and be punctual. Tr. at 286. Dr. De Lambo opined that Plaintiff was only mildly restricted in her ability to maintain her personal hygiene, use good judgment and perform simple tasks. *Id.* at 286-287. She further found that Plaintiff had marked impairment in her abilities to understand, carry out and remember instructions, respond to supervision, co-workers and work pressures, respond appropriately to changes

-11-

in the work setting, perform complex, repetitive or varied tasks, and to behave in an emotionally stable manner.  *Id.*   She diagnosed Plaintiff with panic disorder without agoraphobia, major depressive disorder, and post-traumatic stress disorder and opined that Plaintiff's condition would deteriorate if she was placed under stress, especially job stress.  *Id.* at 287.  She anticipated that Plaintiff would miss work more than three times a week due to her impairments.  *Id.* She also retrospectively concluded that Plaintiff's severe impairments had existed since at least October 28, 2002. *Id.*

## III.     SUMMARY OF TESTIMONIAL EVIDENCE

At the August 25, 2005 hearing before the ALJ, Plaintiff testified that she was forty-two years old and had a tenth-grade education although she had earned her GED.  Tr. at 295.  She had a seventeen year-old son and a nine year-old daughter living with her at the time.  *Id.* Plaintiff had a valid driver's license and had attended the Cleveland Institute of Medical and Dental School to become a medical secretary, but she completed only six months of the nine-month course.  *Id.* at 296.  Plaintiff was working fifteen hours a week at this time at Advance Security as a security officer.  *Id.* at 296-297.  She indicated that her employer offered her forty-one hours per week, which she accepted, but she could not handle the schedule because of her panic attacks.  *Id.* at 298.  Due to a lack of recent medical records in the file, the ALJ continued this hearing in order for Plaintiff to undergo a consultative psychiatric evaluation.  *Id.* at 335.

After the consultative evaluation, another ALJ held a supplemental hearing on June 16, 2006. Tr. at 337.  Plaintiff reported that she was now able to see a psychiatrist and a psychologist after her new primary care doctor recommended Drs. Kantos and De Lambo.  *Id.* at 348.  Plaintiff's attorney explained that there was a large period of time when Plaintiff did not receive ongoing mental health treatment except by her prior primary care physician due to a lack of health insurance.  *Id.*  Plaintiff

-12-

reported that she had been seeing Dr. De Lambo for three or four months now and she had provided a medical source statement.  *Id.*  at 349.  When the ALJ asked how Dr. De Lambo could come to conclusions on the severity of Plaintiff's mental health conditions after treating her for only three or four months, Plaintiff's counsel explained that Dr. De Lambo had the benefit of all of Plaintiff's prior medical records.  *Id.* at 349-350.

Plaintiff was 43 years old at the time of this hearing and had her ten year-old daughter living with her.  Tr. at 353-354.  She was not working at this time and testified that she had last worked in September/October 2005 at a security company that checked cars in and out for Avis Car Rental, but she was fired after two or three months because her stress, depression and panic attacks would make her late for work and would sometimes require her to call off of work.  *Id.* at 354-357.

Plaintiff testified she could not work because she still had major depression and panic attacks.  Tr. at 357.  She related that she had only been on the medications prescribed by Dr. Kantos for the last three weeks and was still suffering the symptoms from these conditions.  *Id.*  She described the impact that her conditions had on her abilities, explaining that she had panic attacks at least once a day which made her heart race and beat hard, and made her sweat, turn red and made her dizzy.  *Id.* at 357, 362.  She indicated that she had to get away until these conditions pass, which sometimes took a long time, sometimes hours.  *Id.* at 358, 362.  Her doctor told her that stress aggravates the panic attacks.  *Id.* at 360.  She explained that the post-traumatic stress syndrome makes her startle, or snap awake, hopping out of bed from a dead sleep in the middle of the night.  *Id.*

With regard to her treatment, Plaintiff explained that her prior primary physician Dr. Borukh prescribed her Paxil, which never fully worked, and referred her to a psychologist in 2002, but she met with the psychologist and did not really like him.  Tr. at 365.  She did not continue with any mental health treatment, explaining that she had a lapse in insurance coverage and she had trouble accepting that she needed help for mental conditions.  *Id.* at 365-366.  Plaintiff was currently seeing

Drs. Kantos and De Lambo and was taking Colonazepam, Lamictal and Wellbutrin. *Id.* at 371.

Dr. Nancy Borgeson, the vocational expert, also testified. *See* Tr. at 380. The ALJ presented a hypothetical question of a forty-three year-old person, with a GED, no exertional limitations, and psychological limitations to simple routine repetitive, low-stress tasks with occasional decision-making, occasional changes in work setting, occasional exercising of judgment, no production rate pace work, occasional interaction with the public and coworkers, but superficial nonconfrontational, nonnegotiation, and no arbitration. *Id.* at 387. Dr. Borgeson concluded that the hypothetical person could not perform any of Plaintiff's past jobs. *Id.* However, Dr. Borgeson testified that the individual could perform other jobs existing in significant numbers in the community, including a cleaner/housekeeper, clerk, and hand packager. *Id.* at 388-389.

Plaintiff's attorney questioned Dr. Borgeson, asking her if the same hypothetical person could sustain the employment presented if she had the additional limitation of absence from work for more than three times per month. Tr. at 390. Dr. Borgeson responded that although the individual could perform the job tasks, she would have trouble sustaining jobs over time. *Id.* at 391.

Plaintiff's attorney added further conditions to the ALJ's hypothetical person of having random panic attacks of at least one per day impacting her abilities to focus and concentrate for thirty minutes to one hour per day. Tr. at 392. Dr. Borgeson replied that such a person could not perform any jobs if those episodes occurred during work time. *Id.* Plaintiff's attorney again changed the hypothetical person, limiting restrictions to marked limitations in: relating to others; concentrating and sustaining attention for extended periods; sustaining a routine without supervision; performing activities within a schedule; maintaining regular attendance; and being punctual. *Id.* at 394. Dr. Borgeson concluded that a person with these limitations would be unable to sustain any employment. *Id.* Plaintiff's attorney presented another hypothetical person, this time including limitations of a marked limitation in her ability to respond appropriately to co-workers, supervisors, customary work

pressures and changes in the work setting. *Id*. at 395. Dr. Borgeson concluded that such a person could perform job tasks, but could not sustain employment over time. *Id.* Finally, Plaintiff's attorney modified the hypothetical individual to include a limitation in the ability to behave in an emotionally stable manner in the course of an eight-hour workday. *Id*. Dr. Borgeson responded that such a person could not maintain any jobs in the marketplace. *Id.*

**IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R. 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th

Cir. 1990).

## V.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *See Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *See Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997).   Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).   It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *See Houston v. Secretary of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.     LAW AND ANALYSIS

### A.     STATEMENT OF LEGAL ERRORS ONE AND TWO

In her first two assertions of error, Plaintiff complains that the ALJ erred by failing to give the retrospective and prospective opinions of her current treating psychologist, Dr. De Lambo, controlling weight.  ECF Dkt. #16 at 9-11.  Plaintiff further asserts that the ALJ erred when he failed to recontact Dr. De Lambo in order to clarify information relating to whether she had the benefit of Plaintiff's prior medical history when she completed her agency questionnaire.  *Id.* at 11-12.  Plaintiff also

asserts that the ALJ lacked substantial evidence in which to find her not disabled.  *Id.*

### 1.     TREATING PHYSICIAN RULE

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004). A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).  Accordingly, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record", unless that presumption is rebutted.  *Wilson,* 378 F.3d at 544. When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "'be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 *(quoting Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir.1999)).  Further, it "ensures that the ALJ applies the treating

physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

### a.  RETROSPECTIVE OPINIONS OF TREATING PSYCHOLOGIST

Plaintiff first argues that the ALJ committed legal error by rejecting Dr. De Lambo's retrospective opinion as to Plaintiff's disabling impairments, citing caselaw holding that retrospective opinions by treating physicians are still binding unless they are contradicted by other evidence or by "overwhelmingly compelling" non-medical evidence.  ECF Dkt. #16 at 5, citing *Shaw v. Apfel*, 221 F.3d 126, 133 (2nd Cir. 2000); *Brown v. Apfel*, 991 F.Supp. 166, 171 (W.D.N.Y 1998).  Plaintiff argues that Dr. De Lambo's conclusions are not contradicted by any medical evidence or by overwhelmingly compelling non-medical evidence.

The ALJ rejected Dr. De Lambo's conclusion that Plaintiff's mental limitations had persisted since her disability onset date because Dr. De Lambo had not treated Plaintiff during that time and because she "was not privy, at least based upon information contained in the evidence, to prior psychotherapy treatment notes."  Tr. at 17.  He further indicated that Dr. De Lambo's opinions were not entirely consistent with the objective evidence.

The Court finds that substantial evidence supports the ALJ's decision to discount Dr. De Lambo's retrospective opinions based upon other medical evidence in the record from that time period that contradicts Dr. De Lambo's retrospective opinions and overwhelmingly compelling non-medical evidence which contradicts her opinions.  Medical evidence in the record from Plaintiff's disability onset date of October 28, 2002 to the date that Dr. De Lambo began treating Plaintiff on February 27, 2006 suggests contrary conclusions to those of Dr. De Lambo.  For example, Plaintiff's primary care

physician at the time, who initially diagnosed Plaintiff with anxiety and depression and prescribed medications, noted that Plaintiff had responded to Xanax and Paxil and she stated that she was unaware of any significant restrictions in Plaintiff's daily living activities due to her impairments. *Id.* at 197-198. She also found that Plaintiff reported feeling well in general and reported no problems or concerns in July 2003. *Id.* at 222. In addition, Dr. Ibrahim, an agency examining psychiatrist, also found that while Plaintiff suffered from major recurrent depression and panic disorder, she had a good ability to relate to others, adequate abilities to understand and follow simple directions, and good abilities to withstand stress and pressure in daily activities. *Id.* at 268. He further found that Plaintiff's abilities to understand, remember and carry out instructions, and her abilities to respond appropriately to supervisors, co-workers and work pressures were not affected by her impairments. *Id.* at 269-270. Agency-reviewing psychologist Tishler also found that Plaintiff was only mildly limited in her daily living activities and in maintaining concentration, persistence and pace, and moderately limited in maintaining social functioning. *Id.* at 171-176. Overwhelming non-medical evidence also supports the ALJ's decision to discount Dr. De Lambo's opinions at this time because Plaintiff was working a full-time job in 2003 as well as caring for her children. *Id.* at 267.

The Court notes the May 2003 findings of Dr. Leach, which indicate that Plaintiff had a GAF of 65 indicating mild symptoms but in which Dr. Leach opined that Plaintiff was suffering from "significant psychological and emotional distress" which would affect her ability to work. Tr. at 164-165. However, nowhere in Dr. Leach's opinion does he define the word "significant" so as to express the degree of limitation or the impact of Plaintiff's emotional issues and impairments on her ability to work. With a GAF indicating mild symptoms, it is likely that Dr. Leach's meaning of the word "significant" connotes notable symptoms in the clinical sense as opposed to substantial symptoms in the everyday usage of the word "significant". Notwithstanding, the standard of review is whether substantial evidence supports the ALJ's decision, not whether substantial evidence supports a finding

to the contrary.  *McClanahan*, 474 F.3d at 839 -840.  Here, substantial evidence supports the ALJ's decision to discount Dr. De Lambo's retrospective opinions because the record does contain findings, conclusions and opinions from numerous other physicians and psychologists during the relevant time period that contradict her opinions.  Moreover, overwhelmingly compelling non-medical evidence also supports the ALJ's decision.

Consequently, these contradictory opinions and non-medical evidence constitute substantial evidence to support the ALJ's decision to discount Dr. De Lambo's retrospective diagnoses and conclusions.

In addition, the ALJ correctly found that no record evidence supported a finding that Dr. De Lambo had the benefit of Plaintiff's prior medical records when she made her diagnoses and conclusions finding that Plaintiff had marked limitations in nearly all areas of mental functioning. While Plaintiff's counsel repeatedly stated at the ALJ hearing that she thought that Dr. De Lambo had all of the prior medical records when she made her conclusions, this does not constitute evidence and Dr. De Lambo did not definitively indicate as much in the record before the ALJ.  Tr. at 349, 350, 351, 399, 401.   Counsel's representations are not evidence; Dr. De Lambo's report, void of any indication that she reviewed Plaintiff's medical records, was the only evidence available to the ALJ on this issue at the time.

### b.       FAILING TO RECONTACT DR. DE LAMBO

Plaintiff further asserts that the ALJ erred by failing to recontact Dr. De Lambo in order to clarify information that she provided with regard to whether she had the benefit of Plaintiff's past treatment records when she completed the agency questionnaire.  ECF Dkt. #16 at 11.  However, 20 C.F.R. § 404.1527(c)(3) provides that the Agency can recontact a treating source when it does not "have sufficient evidence to decide" disability, "or, if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled."  Here, as properly determined by the ALJ,

Dr. De Lambo's findings did not support her retrospective opinion of disabling limitations because medical evidence existing in the record during the relevant time period contradicted her conclusions as other doctors had found that she was not disabled and overwhelmingly compelling non-medical evidence also supported a finding that Dr. De Lambo's disabling limitations were not supported. Thus, the ALJ was not obligated to recontact Dr. De Lambo.

### c.        PROSPECTIVE OPINIONS OF TREATING PSYCHOLOGIST

In addition to arguing that the ALJ committed legal error by failing to give deference to the retrospective opinions of Dr. De Lambo, Plaintiff also argues that the ALJ erred by discounting Dr. De Lambo's current opinions in which she concluded that Plaintiff had marked limitations in her abilities to relate to other people, perform daily activities, maintain concentration and attention for extended periods, sustain a routine without special supervision, perform activities within a schedule, maintain regular attendance, and be punctual.  ECF Dkt. #16 at 9-10.  Identical to her arguments about discounting Dr. De Lambo's retrospective opinions, Plaintiff also argues here that the ALJ erroneously relied upon Dr. De Lambo's treatment notes and not her actual findings and relied upon the actual findings of the consulting and examining physicians and not their conclusions about Plaintiff to support his decision that Plaintiff was not disabled.  ECF Dkt. #16 at 10.

For example, Plaintiff argues that the ALJ relied upon Dr. De Lambo's treatment notes which indicated that Plaintiff's progress was good, but did not apply her agency questionnaire responses in which she concluded that Plaintiff had marked limitations in almost all areas of mental functioning. ECF Dkt. #16 at 10.  Plaintiff compares this to the ALJ's use of the examining and reviewing physicians' findings and conclusions, pointing out that the ALJ relied upon the conclusions of a non-examining consultative doctor and relied upon Dr. Leach's conclusion that Plaintiff had a mild GAF of 65, but disregarded his findings that Plaintiff suffered from significant psychological symptoms which impacted her abilities to work.  *Id*.

In addition, the ALJ properly discounted Dr. De Lambo's prospective opinions finding Plaintiff disabled when he found that her conclusions were inconsistent with her own treatment notes regarding Plaintiff.  Tr. at 18.  The ALJ noted that Dr. De Lambo found Plaintiff to be markedly limited in almost all areas of mental functioning, but noted in her treatment records that she labeled Plaintiff's progress as "good" and noted no episodes of decompensation or deterioration.  *Id.*

As explained above, a presumption exists that the opinion of a treating physician is entitled to great deference.  *Rogers,* 486 F.3d at 243.  Thus, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*  Further, if an ALJ decides to discount or reject a treating physician opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  That, is, the ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

In this case, the Court agrees with the ALJ that Dr. De Lambo's prospective opinions are not well-supported.  The undersigned further finds that the ALJ adequately articulated the reasons for discounting Dr. De Lambo's recent opinions.  He properly found that Dr. De Lambo's conclusions were not supported by her treatment notes[1] or the record.  As pointed out by the ALJ, Dr. De Lambo

---

[1]  The Court notes that the ALJ had incorrectly found that Dr. De Lambo's opinions were not entitled to significant weight because she had only treated Plaintiff at most once per month.  *Id.* at 17.  The record shows that Dr. De Lambo had treated Plaintiff for therapeutic purposes four times within one and a-half months and not just once a month as found by the ALJ.  *Id.* at 277-279.  She conducted her initial

-22-

noted "good" at each session under the "Goals/Progress" caption of her progress notes.  Tr. at 276-280.  Dr. De Lambo noted that Plaintiff was "progressing" at each session as well.  *Id.*  Neither her treatment notes nor her assessment provide sufficient support for Dr. De Lambo's findings indicating that Plaintiff was markedly limited in her abilities to relate to other people, perform daily living activities, maintaining concentration and attention for extended periods, sustaining a routine without special supervision, performing activities within a schedule, understanding, executing and remembering instructions, responding appropriately to supervision, co-workers, customary work pressures and changes in the work setting, and in performing complex, repetitive or varied tasks and behaving in an emotionally stable manner.  *Id.* at 286-287.  Nor do her treatment notes or assessment provide support for her findings that Plaintiff's condition would likely deteriorate if she was placed under job stress or that she would miss work more than three times per month because of her mental impairments.  *Id.* at 287.

Dr. De Lambo's treatment notes merely outline Plaintiff's problems and the techniques she suggested to help Plaintiff, such as the establishment of routines, practicing relaxation and grounding techniques, and practicing breathing techniques.  *Id.* at 277-279.  Further, Dr. De Lambo noted in one of her sessions that Plaintiff's "homework" was to continue her job search.  *Id.* at 277.  In addition, the initial evaluation by Dr. Kantos, the psychiatrist who referred Plaintiff to Dr. De Lambo, does not provide support for Dr. De Lambo's opinions.  He found that Plaintiff was alert and oriented, and her judgment and insight were fair, and that her depression, anger, anxiety and anhedonia were mild, with no memory disturbance.  *Id.* at 274.

In summary, Dr. De Lambo's records lack any objective observations that support her conclusions.  Consequently, her opinions are not entitled to deference under the treating physician rule

---

evaluation of Plaintiff in February 2006 and treated her on March 8, 2006, March 22, 2006, April 5, 2006 and April 26, 2006.  *Id.* at 277-280.  Notwithstanding, the Court finds for the reasons stated *infra*, that substantial evidence supports the ALJ's decision to discount Dr. De Lambo's opinions.

as they are unsupported and conclusory.

### d.     ALJ'S FINDING THAT PLAINTIFF WAS NOT DISABLED

Having determined that the ALJ was justified in discounting Dr. De Lambo's retrospective and prospective opinions, the Court will now address whether substantial evidence exists to support the ALJ's finding that Plaintiff was not disabled. While substantial evidence may exist to support a finding of disability, the proper standard is whether substantial evidence supports the ALJ's decision finding that Plaintiff was not disabled. This Court cannot reverse the ALJ's finding on disability merely because substantial evidence exists in the record to support a different conclusion. *McClanahan*, 474 F.3d at 839 -840.

The undersigned rejects some of the ALJ's reasons for finding Plaintiff not disabled. In determining that Plaintiff's mental health impairments did not render her disabled for purposes of social security, the ALJ first notes Plaintiff's brief and sporadic treatment for her conditions. Tr. at 17. He indicates that even when Plaintiff had medical insurance and could afford treatment, she did not obtain it. *Id.* He further states that Plaintiff has never been hospitalized for her mental impairments and she did not accept that she needed psychotherapy or medication. *Id*. at 18.

These findings are contrary to law. The Sixth Circuit has held that it is a questionable practice to chastise an individual with a mental impairment for exercising poor judgment in seeking rehabilitation when the mental impairment may be the reason for a claimant's failure to do so. *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). Here, the ALJ is doing just that as he further states in his decision that:

> [], Ms. Gantt has been prescribed and has taken appropriate medications for her severe impairments, which she reported were relatively effective in controlling her symptoms. Nevertheless, based upon Ms. Gantt's testimony, it does not seem that even she believes psychotherapy or treatment with medication is necessary. Based on her testimony, Ms. Gantt has not accepted that she needs psychotherapy and does not believe the medication works. For those reasons, she was non-compliant with recommended treatment. Moreover, while I cannot deride Ms. Gantt for being unable to afford mental health treatment, it seems as if for several years she has health

> insurance coverage and was indeed able to afford treatment. Her treatment history is brief, sporadic, and infrequent and the reason she did not seek treatment is obvious–that she did not believe she needed it. However, it seems illogical that Ms. Gantt should complain she is disabled by mental illnesses for which she refuses to seek treatment.

Tr. at 17.

The ALJ further found that Plaintiff has been able to hold jobs and care for her young child with little assistance and handles her financial matters, visits with friends, drives and bowls. Tr. at 17. However, since at least late 2005, Plaintiff has not held a job as Dr. De Lambo had noted with each session that Plaintiff was unemployed or looking for work and Plaintiff testified at the June 2006 hearing that she had not worked since 2005. *Id.* at 279-282, 355-356. Plaintiff indicated that she had left her last job in the security field because of stress, depression and panic attacks. *Id.* at 356. Moreover, performing some activities does not equate to a finding that Plaintiff is able to work eight hours per day. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3rd Cir. 1981). Sporadic or transitory activity does not disprove disability. *Id.*

Despite rejecting these two reasons for finding Plaintiff not disabled, substantial evidence nevertheless supports the ALJ's finding that Plaintiff was not disabled. As indicated above, the Court finds that substantial evidence supports the ALJ's decisions to reject both the retrospective and the prospective opinions of Dr. De Lambo. Accordingly, the remaining medical and non-medical evidence must be assessed, which includes the findings and opinions of Plaintiff's treating primary care physician, and the findings, opinions and conclusions of Drs. Ibrahim, Leach and Tishler. These findings, conclusions and opinions constitute substantial evidence to support the ALJ's finding that Plaintiff was not disabled. Plaintiff's treating primary care physician found her responding well to medications between 2002 and 2005 and indicated that she was unaware of any significant restrictions in Plaintiff's daily living activities due to her impairments. Tr. at 197-198. Further, Dr. Ibrahim had

found that despite her impairments, Plaintiff had a good ability to relate to others, adequate abilities to understand and follow simple directions, and good abilities to withstand stress and pressure in daily activities.  *Id*. at 268.  He further found that Plaintiff's abilities to understand, remember and carry out instructions, and her abilities to respond appropriately to supervisors, co-workers and work pressures were not affected by her impairments.  *Id*. at 269-270.  Agency-reviewing psychologist Tishler also found that Plaintiff was only mildly limited in her daily living activities and in maintaining concentration, persistence and pace, and moderately limited in maintaining social functioning.  *Id.* at 171-176.  Moreover, Plaintiff was able to work a full-time job in 2003 and care for her children.  *Id*. at 267.  And, as explained more fully above, while Dr. Leach had indicated that Plaintiff's "significant psychological and emotional distress" would affect her ability to work, he issued her a GAF of 65, indicating mild symptoms and failed to define "significant" or the degree of impact that her mental impairments would have on her ability to work.

Further, the ALJ carved out a mental RFC that corresponded to the limitations presented by the medical evidence, that is, he limited Plaintiff to simple, routine, repetitive tasks in a low-stress work environment with occasional decision-making, occasional changes in the work setting, and occasional exercise of judgment, no production rate pace work and only occasional interaction involving superficial, non-confrontation, non-negotiation, and non-arbitration contact with the public and coworkers.  *Id.* at 15.

These findings constitute substantial evidence to support the ALJ's finding that Plaintiff was not disabled due to her mental impairments.

### B.  STATEMENT OF LEGAL ERROR NUMBER THREE

Plaintiff also argues that the ALJ committed legal error by failing to incorporate all of her limitations into the hypothetical question that he presented to the ALJ.  ECF Dkt. #16 at 12.  Plaintiff contends that the ALJ failed to present to the vocational expert a hypothetical individual whose panic

attacks were frequent enough to interfere with her ability to remain punctual and attend work regularly as Dr. De Lambo had opined that Plaintiff would miss work more than three times per month due to her mental impairments.  *Id.*

The ALJ was not required to incorporate this limitation into his hypothetical question to the vocational expert because he found that Dr. De Lambo's opinion as to this limitation was unsupported by any medical evidence.  *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Such a lack of support as to this physical restriction serves as substantial evidence to support a finding of non-disability.  *Maher v. Sec'y of Health and Human Servs.*, 898 F.2d 1106, 1109 (1989).  An ALJ need pose hypothetical questions to the vocational expert that incorporate only those limitations that he accepts as credible.  *Casey*, 987 F.2d at 1235.

The ALJ in the instant case presented a hypothetical question to the vocational expert that included those limitations that he found to exist and that this Court finds are supported by substantial evidence.  Substantial evidence also supported the ALJ's decision not to include the absence of work more than three times per month as Dr. De Lambo's conclusion as to this limitation was not supported by her treatment notes or other evidence of record.  The vocational expert responded that a significant number of jobs existed that the ALJ's hypothetical person could perform.  Tr. at 386-391.  Thus, substantial evidence supported the ALJ's finding that Plaintiff could perform a significant number of jobs existing in the national economy with her limitations.  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

### C.  STATEMENT OF LEGAL ERROR NUMBER FOUR

Finally, Plaintiff asserts that the ALJ erred because he should have found her disabled as her case fell within the parameters of the example listed in SSR 85-15, which discusses how Agency decisionmakers should assess circumstances in which a claimant has only nonexertional limitations.  ECF Dkt. #16 at 13.  This Ruling indicates that where a person suffers from solely nonexertional

impairments, the Medical Vocational Rules do not direct conclusions of disabled or not disabled but rather the regulations must be applied, giving consideration to the Medical Vocational Rules for specific case situations. SSR 85-15. The Ruling provides an assessment outline to follow in such a situation, indicating that when no medically determinable impairment exists which limits a claimant's exertion, the first issue to consider is the extent to which the claimant's occupational base is reduced by the effects of the nonexertional impairment. *Id*. The second issue to consider is whether the claimant can be expected to make a vocational adjustment considering the interaction of her remaining occupational base with her age, education and work experience. *Id*. The final consideration, when the claimant's only impairment is a mental one, and it is not of Listing severity, but prevents the claimant from meeting the mental demands of past relevant work, is whether the claimant can be expected to perform unskilled work. *Id.*

Plaintiff contends that her situation is identical to the example described in section 1 of SSR 85-5 entitled "Examples of Nonexertional Impairments and Their Effects on the Occupational Base" and thus the ALJ was required to find her disabled. *Id*. That example and the immediately preceding relevant section of SSR 85-15 state:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

> Example 1: A person whose vocational factors of age, education, and work experience would ordinarily be considered favorable (i.e., very young age, university education, and highly skilled work experience) would have a severely limited occupational base if he or she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations. A finding of disability would be appropriate.

Plaintiff asserts that this example fits her circumstances because

-28-

> [s]he does not even have university education or highly skilled work experience and even if she did, her occupational base would be severely eroded. The opinions of the treating physicians show that she has a substantial loss to respond appropriately to normal work environments on a sustained basis. This calls for a finding of disability.

ECF Dkt. #16 at 14. She therefore asserts that the ALJ was required to find her disabled under this example. *Id.*

The Court finds Plaintiff's assertion to be without merit. Plaintiff provides no legal support for her assertion that SSR 85-15 mandates a finding of disability. In *Doneworth v. Shalala*, the Sixth Circuit suggests to the contrary when it finds that this Ruling "makes clear that a mental impairment alone, even if not meeting the Listing of Impairment *may* dictate a finding that a claimant is unable to perform substantial work." No. 94-4290, 1996 WL 26922 at *4 (6th Cir. Jan. 23, 1996), unpublished (emphasis added). The Court went on to hold that SSR 85-15 "provides guidance only for cases in which the claimant asserts 'solely nonexertional impairments.'" *Id.*

Further, the Ruling itself suggests that it provides only mere guidance:

> The original purpose of SSR 83-13 [one of the SSRs that SSR 85-15 revised] was to clarify how the regulations and the exertionally based numbered decisional rules in Appendix 2, Subpart P, Regulations No. 4, provide a framework for decisions concerning persons who have only a nonexertional limitation(s) of function or an environmental restriction(s). The purpose of this revision to SSR 83-13 and SSR 85-7 is to emphasize, in the sections relating to mental impairments: (1) that the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis; and (2) that a finding of disability can be appropriate for an individual who has a severe mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities in age, education, or work experience.

SSR 85-15. The Ruling goes on to state that it "clarifies policies applicable in cases involving the evaluation of solely nonexertional impairments." *Id.*

Nevertheless, the ALJ complied with this SSR because in his decision, he cited SSR 85-15 and found that the Medical Vocational Guidelines could only be used as a framework for decision-making

when a claimant has only nonexertional limitations. Tr. at 19.  He further found that Plaintiff's ability to perform work at all exertional levels was compromised by her nonexertional limitations.  *Id.*  He noted that he consulted the vocational expert at the hearing and asked her whether a person of Plaintiff's age, education, work experience with a RFC that he found was supported by the medical evidence (all levels of exertional work but limited to simple, routine tasks, low-stress jobs, with occasional decision-making, occasional changes in the work setting, occasional exercise of judgment, no production rate pace work, and contact with others that was superficial, non-confrontational, and non-negotiation or non-arbitration-related) could perform other jobs existing in the economy.  *Id.* at 15.  The vocational expert responded that such an individual could still perform significant numbers of jobs in the economy and listed those jobs.  *Id.* at 386-387.

This complies with the Ruling because the Ruling itself encourages the use of a vocational expert as it mentions the use of a vocational expert or resource on numerous occasions, indicating that "[t]he publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient vocational resources for relatively simple issues. In more complex cases, a person or persons with specialized knowledge would be helpful."  SSR 85-15.  The Ruling additionally states that "in many cases a decisionmaker will need to consult a vocational resource"...and "the assistance of a vocational resource may be helpful".  *Id.*

## VII.    CONCLUSION

Based upon a review of the record, the Statements of Error and the law and analysis provided above, this Court AFFIRMS the decision of the ALJ because substantial evidence supports his finding that Plaintiff was not disabled.

Dated:   January 10, 2008                              */s/George J. Limbert*

                                         GEORGE J. LIMBERT
                                         U.S. MAGISTRATE JUDGE